**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roy Valentine GILLILAND,
Defendant-Appellant.**

No. 77–2099.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Aug. 8, 1978.

Decided Nov. 22, 1978.

Richard D. Judd, Denver, Colo., for defendant-appellant.

Charles Lee Waters, Asst. U. S. Atty., Oklahoma City, Okl. (Larry D. Patton, U. S. Atty., Oklahoma City, Okl., on the brief), for plaintiff-appellee.

Before SETH, BARRETT and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal from a jury conviction of Roy Valentine Gilliland for transportation of a stolen automobile across state lines in violation of the Dyer Act, 18 U.S.C. § 2312.

The issues upon appeal relate to the propriety of certain questions asked of Gilliland's stepson, Billy Tull, who appeared as a defense witness, concerning criminal convictions of Gilliland 14 to 34 years prior to the offense involved in this trial.

The federal prosecutors presented their case based principally upon stopping defendant near Guymon, Oklahoma while he was driving a vehicle stolen a few hours earlier in Dumas, Texas. The totality of the government's evidence was ample to support the jury conviction, in the absence of the error discussed herein. The defense was that Gilliland did not steal the car, but bought it on approval from a purported car salesman in a bar in Oklahoma, with a portion of the consideration being repayment of a gambling debt owed by the salesman to Gilliland. Defendant's stepson Billy Tull was a defense witness presented as one who had been present at the transfer and who had personally observed much of the paper work in the exchange of title. After Tull had so testified the government attorney initiated his cross-examination as follows:

Q How long have you known this Defendant, your step father?

A Approximately 11 years.

Q As I understand it, you are telling the ladies and gentlemen of the Jury, he is just the kind of man that would not do this thing; is that right?

A Yes, sir.

Q He is the kind of man who would not steal a car and take it across the state line; it is that correct?

A Yes, sir.

Q And he is certainly the kind of man who would not forge items like you have in front of you there; is that correct?

A Yes, sir.

Q He just wouldn't do that?

A No, sir.

MR. MILLER: May I approach the bench if the Court please?

FOLLOWING PROCEEDINGS HELD AT BENCH OUT OF THE HEARING OF THE JURY:

MR. MILLER: I have got two things to advise the Court. I am going to ask this man about his step father's criminal record because he has been convicted twice of the Dyer Act. He has been convicted twice of Forgery. He has been convicted more times of that. I want to ask him about those particular convictions. Some of these convictions are more than ten years old. Some of them are not more than ten years old, but I knew there is a Rule of Court.

THE COURT: Credibility rule doesn't apply here.

MR. MILLER: I wanted to clear it with the Court.

THE COURT: You may do so over the objection of the Defendant.

(Following proceedings held in Open Court)

THE COURT: Go ahead, Mr. Miller.

Q (By Mr. Miller) Mr. Tull, did you know that your step father in 1942 in Del Rio, Texas, in the Federal Court there

was convicted of the Dyer Act, which is transporting motor vehicles across the state line, and was sentenced to two years in the Federal Reformatory?

A I knew he had been in prison, but I did not know why.

Q Mr. Tull, did you know that your step father in October of 1961 was convicted of Dyer Act, which is transporting a motor vehicle across the state line in Los Angeles, California, and was sentenced to five years in the Federal Penitentiary?

A No, sir, I did not know about that.

Q Mr. Tull, did you know that your step father was convicted in November of 1950 in Sacramento, California, of two separate counts of Forgery and was convicted and sentenced to a term of 1 to 14 years on each one of those counts?

A No, sir.

Q Mr. Tull, did you know that your step father was convicted in February of 1962 of Interstate Transportation of Forged Securities in Federal Court in Fort Worth, Texas—that is wrong. It would have been in California that he was convicted, but he was sentenced at that time to another five years in the Federal Reformatory and he was in a Reformatory in Fort Worth, Texas. Did you know that?

A No, sir.

Q Now let me ask you this: Do you think your step father is capable of stealing cars and taking them across the state line?

A Sir, for the 11 years that I have known him, I would say no.

Q Do you think your step father is capable of forging documents like you have got right there in front of you?

A I would say no.

After Tull, defendant's wife also appeared as a witness and was asked upon direct examination about Gilliland's previous criminal "trouble," of which she acknowledged some knowledge. The prior convictions were probed again in cross-examination of Mrs. Gilliland. Defendant Gilliland himself later took the stand and attempted to explain the convictions to which previous references had been made.

The judge's jury instructions referenced the criminal record evidence only in the following terms:

Evidence has been permitted to come before you in this case tending to show, if you believe it to be true, that the Defendant may have committed or participated in the commission of other and distinct offenses from one charged in the indictment. In this connection you are reminded that your verdict in this case must respond only to the specific charge set forth in the indictment and that a person may not be convicted of one offense by evidence tending to show that he may have committed or participated in the commission of other offenses. Such evidence as may have tended to show the commission of other offenses was admitted for the purpose of establishing, if same does establish, a plan, scheme or design to commit the specific offense charged in the indictment or to establish unlawful intent, if in the judgment of the jury same does tend to establish such. Furthermore, if you believe that the Defendant has been heretofore convicted as claimed by the prosecution, then you may, in your discretion, consider the same as such facts may or may not, in your judgment, affect the weight and credit which you will give to the testimony of the Defendant. A person may not be convicted of one offense or crime by any proof tending to show that he may or may not have been convicted of another offense.

No objection was made to the jury instructions at the time of trial, but it was raised in this Court as "plain error" requiring reversal.

Although defendant's appeal is predicated upon the Billy Tull cross-examination quoted above, its effect upon the presenta-

tion of the defendant's case, and the jury instructions, we note one other item deserving of our consideration under the "plain error" doctrine. Following the questioning of Billy Tull excerpted above, the government prosecutor made the following inquiry of Tull:

Q Could you tell me why if you were really in a bar in Texhoma, Oklahoma, and watched your step father purchase a car, why wouldn't your step father when questioned by the FBI agent tell the FBI agent that?

A I don't—

MR. PAGE: We object to the form of the question and ask that is a conclusion on the part of this witness as to why he would not answer it.

THE COURT: Overruled. Cross examination.

Q (By Mr. Miller) Do you know why he wouldn't tell the FBI agent that?

A No, sir, I do not know why he would tell the FBI agent that.

Q Do you live in Denver?

A Boudler, [sic] Colorado.

Q You live in Boulder?

A Yes, sir.

Q Do you know why your step father would tell the FBI agent that you lived in Denver?

A No, sir, I don't know why he would tell them that.

Q Do you know why he would tell the FBI agent that he didn't have any idea how to get in touch with you, didn't know anything other than who you were and you lived in Denver?

A I have a pretty good idea.

Q Why?

A Because he is not his lawyer. He is not trying to help him. He is trying to hurt him. So in my opinion, I would have done the same thing.

Q How is that going to hurt your father to tell the truth about where he was?

A I don't know.

Q Well, you just said that it would hurt him. I would like to know how it could hurt him. I don't know how it could do anything but help him.

## I

The government attempts to justify its inquiry into the criminal convictions on grounds that Tull was testifying as to the character of the defendant. The general rule is, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Fed.R. Evid. 404(b). The rationale for this exclusionary rule is well-stated by Mr. Justice Jackson in *Michelson v. United States,* 335 U.S. 469, 475–476, 69 S.Ct. 213, 218–219, 93 L.Ed. 168 (1948):

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, *Greer v. United States,* 245 U.S. 559, 38 S.Ct. 209, 62 L.Ed. 469 but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy is excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise

and undue prejudice. (Footnotes omitted.)

The accused defendant may make character an issue, however, for the reasons also outlined in the *Michelson* case:

> But this line of inquiry firmly denied to the State is opened to the defendant because character is relevant in resolving probabilities of guilt. He may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged. This privilege is sometimes valuable to a defendant for this Court has held that such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt and that in the federal courts a jury in a proper case should be so instructed. *Edgington v. United States,* 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467. (Footnotes omitted.)

335 U.S. at 476, 69 S.Ct. at 219.

 If the defendant utilizes a character witness then the government may cross-examine or introduce evidence of prior convictions to rebut the defense evidence of good character. Fed.R.Evid. 404(a)(1), 405(a). The judge, of course, has a duty of continuing surveillance as to whether the evidence's prejudicial effect outweighs its probative value. *Id.* 403. We do not need to discuss application of Rule 403 here, however, because Billy Tull was not a character witness. His entire testimony on direct examination was as purported eyewitness to the purchase of the automobile. The government may not turn him into a character witness by asking him what kind of a man defendant was, and then use those questions to bootstrap into the case evidence of defendant's prior convictions which it was prohibited from using in its case-in-chief.

## II

 It is argued the inquiry into the criminal record of defendant may be justified as showing intent, plan, scheme or design, under Fed.R.Evid. 404(b). The jury instructions expressly stated that this was one basis for admitting the evidence.

This Court has rejected such an argument in a case squarely in point and controlling here. *United States v. Burkhart,* 458 F.2d 201 (10th Cir. 1972), was a Dyer Act case, where the government introduced evidence of Dyer Act convictions of defendant 4 and 15 years before as relevant to the elements of criminal intent, knowledge, plan or scheme. This Court, sitting en banc, rejected the evidence and ordered a new trial. Judge Doyle's opinion for the Court contains an exhaustive review of the cases. It makes the following commentary on the reluctance of the courts to admit such evidence:

> Several factors have contributed to formulation of a cautious judicial attitude.

> First, the accused is required to defend charges which are not described in the information or indictment. As a result he is required to defend past actions which he may have in the past answered and with respect to which he may have even served his sentence. Thus, he is in effect tried as a recidivist though such a charge is not a part of the federal criminal code.

> Secondly, although such evidence may have at least some relevance to the offense being tried, its predominant quality is to show up the defendant's character as a car thief or a bad check artist, for example. Proof of defendant's sociopathic disposition is not a valid object. Showing that a man is generally bad has never been under our system allowable. The defendant has a right to be tried on the truth of the specific charge contained in the indictment.

> Third, an obvious truth is that once prior convictions are introduced the trial is, for all practical purposes, completed and the guilty outcome follows as a mere formality. This is true regardless of the care and caution employed by the court in instructing the jury.

Thus, it is clear that the problem is not a simple evidentiary one, but rather goes to the fundamental fairness and justice of the trial itself.

458 F.2d at 204–205.

In the present case the convictions were from 14 to 34 years prior to the offense charged, which makes them significantly less relevant than were the ones involved in *Burkhart.*

### III

 The court's instructions indicate that the jury may consider the prior convictions as affecting the defendant's credibility as a witness. Counsel argued that when defendant took the stand it cured any defects involved in admitting the evidence of the prior convictions. We do not agree.

Even if we treat this as a normal case where the defendant takes the stand in his own defense, subjecting him to Fed.R.Evid. 609, the evidence was not proper. While that rule permits evidence of conviction of prior crimes for impeachment of a witness, such evidence is not admissible if more than ten years have elapsed since the date of conviction or release of the witness from confinement, unless certain tests are met. The court must determine "that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." *Id.* 609(b). And evidence of convictions more than 10 years old is not permitted unless the defendant is given "sufficient advance written notice of intent to use such evidence to provide . . . a fair opportunity to contest the use of such evidence." *Ibid.*

The convictions here were from 14 to 34 years before the crime charged. No written notice of intent to use them is shown in the record. The colloquy outside the presence of the jury where the trial judge says "credibility rule doesn't apply here," cannot be taken as a finding that the probative value outweighs the prejudice under the specific facts and circumstances.

### IV

 The inquiries directed to Tull during cross-examination as to why the defendant would not tell the FBI agent the truth about where Tull lived or how to get in touch with him, can be viewed as attacks upon the character of the defendant. As such, these references to prior acts of the defendant, his lies or silences during crucial questioning, are improper unless defendant has put his character in issue under the analysis outlined in Part I above.

The inquiries as to why the defendant would not tell the FBI agent that he had been in a bar, that Tull was with him, and "the truth," and the prosecutor's comments thereon are improper comments upon the defendant's constitutional right to remain silent. In several cases this court has noted as plain or fundamental error questions to a witness, including the defendant himself, which reveal that defendant refused comment when questioned by police or FBI agents, when the prosecution made comments which stated or inferred that there was something wrong with defendant's failure to deny or explain. *United States v. Arnold,* 425 F.2d 204 (10th Cir. 1970); *see also, Deats v. Rodriguez,* 477 F.2d 1023 (10th Cir. 1973); *Johnson v. Patterson,* 475 F.2d 1066 (10th Cir. 1973). The instant situation falls easily within that line of cases.

### V

In oral argument counsel urged that even if error had been committed in this case it was harmless. Certainly we agree there was sufficient evidence of defendant's guilt to support the verdict. But there is also no doubt that when the prior convictions were permitted to be shown during the cross-examination of witness Tull it had a profound effect upon the defense of the case. Probably Mrs. Gilliland would have been used as a defense witness; but no doubt she would not have gone into her husband's previous trouble with the law. Defendant might

have taken the stand in his own defense, but certainly he would not have had to spend the bulk of his time trying to minimize the effects upon the jury of the previous convictions.

The concept of harmless error is different in a criminal case from what is required in civil litigation, because of the requirement to prove guilt beyond a reasonable doubt. Thus the error must be harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We have consistently held that error such as that involved here requires reversal, even in the face of other evidence ample to support the verdict. *See United States v. Burkhart,* 458 F.2d 201 (10th Cir. 1972); *United States v. Arnold,* 425 F.2d 204 (10th Cir. 1970).

The judgment of the district court is reversed, and the cause is remanded for a new trial.